Filing # 119323138 E-Filed 01/08/2021 03:44:11 PM

IN THE CIRCUIT COURT OF THE
SEVENTH JUDICIAL CIRCUIT IN AND
FOR ST. JOHNS COUNTY, FLORIDA

CASE NO.

YOUSSEF HOSSAM, an individual,

     Plaintiffs,

v.

ATP TOUR INC., a Delaware corporation,
GAYLE BRADSHAW, an individual, and
COURTNEY MCBRIDE, an individual,

     Defendants.

_____/

## COMPLAINT

     Plaintiff, Youssef Hossam ("YH" or "Plaintiff"), through undersigned counsel, files this Complaint against Defendants ATP Tour Inc. ("ATP"), Gayle Bradshaw individually ("Mr. Bradshaw"), and Courtney McBride individually ("Ms. McBride"), and alleges as follows:

### I.   NATURE OF THIS ACTION

     1.  This is an action to recover money damages from defendants ATP, Mr. Bradshaw, and Ms. McBride, based upon their tortious misconduct, grossly negligent discharge and breach of their duties, egregious discrimination, and false accusations lacking in credible evidence, which caused YH significant and irreparable damages to his Tennis Career including, but not limited to: damages to YH's name, reputation, and good will; loss of existing and potential sponsorship funds and contracts; loss of existing and potential employment opportunities; loss of career advancement opportunities; loss of potential prize money; loss of alternative employment opportunities related to the sport of professional tennis; and other significant compensatory, special and consequential damages. Pursuant to Rule 1.190(f), Fla. R. Civ. P., YH expressly reserves the right to amend this Complaint to add a claim for punitive damages at an appropriate time prior to trial.

## II.    JURISDICTION AND VENUE

2.  This Court has subject matter jurisdiction over this action pursuant to Section 26.012, Florida Statutes. The amount in controversy is in excess of USD $15,000, exclusive of interest, costs, and attorney's fees.

3.  This Court has personal jurisdiction over each of the Defendants pursuant to Section 48.193, Florida Statutes.

4.  Defendant, Mr. Bradshaw, is an individual who resides in Florida, committed the torts alleged in Florida and is otherwise *sui juris*.

5.  Defendant, Ms. McBride, is an individual who resides in Florida, committed the torts alleged in Florida and is otherwise *sui juris*.

6.  Defendant, ATP, is a Delaware non-profit corporation formed in 1987, with principal place of business in Ponte Vedra, Florida. From the formation of the company to date, ATP engages in substantial and not isolated activities and operates its business including, but not limited to, organizing, overseeing, sanctioning and/or governing (solely or in conjunction with other entities) multiple tennis tournaments from which it derives significant income. Further, ATP employs numerous individuals working in several departments (including the department of player services, officiating, legal, information technology, accounting and finance, human resources, and customer services), employs several officers, and negotiates with sponsors and tournament owners located in Florida. Moreover, ATP committed the torts alleged herein in Florida and is subject to the jurisdiction of the Court.

7.  Venue is proper in this Court because ATP's principal place of business is in St. John's County and Mr. Bradshaw resides in St. John's County.

## III.    THE PARTIES

8.  YH is a young Egyptian dedicated professional tennis player born on ███████. From 2014 to 2017, he was three times African Junior Champion. He has been ranked No. 8 on the International Tennis Federation ("ITF") Junior Circuit, and achieved a doubles ranking of No. 562 at the ATP Circuit in November 2017. In 2017, at the age of 19, YH further achieved an ATP singles ranking of No. 291. He

has been referred to as a "great hope of African tennis" and the "only Arab in the Australian Open juniors draw." YH represented Egypt at the Davis Cup, where he had an impressive W/L record of 9-2. YH worked tirelessly and tenaciously to reach these incredible achievements.

9. ATP, formerly known as the Association of Tennis Professionals, Inc., consists of members who are individual tennis players and tennis tournament owners. ATP organizes, oversees and governs (solely or in conjunction with other entities), the official international circuit of men's professional tournaments known as ATP. Prior to 1990, ATP was strictly a player membership corporation. ATP's traditional role has been to serve the players' interests. According to ATP's Articles of Incorporation and Bylaws, ATP's purposes are, among others, to promote and further the interest of professional tennis players, and to improve the conditions under which professional tennis players engage in their occupation.

10. In line with its purposes and consequent duties, ATP purports to provide various services to its player members including, but not limited to, creating more opportunities to play, providing on-site services, assisting with players' entries into ATP tournaments, providing physiotherapist and related services, providing general career advice, assisting with media relations, providing medical and pension benefits, acting as a liaison with event officials, and assisting collecting prize money, among other tasks. In sum, ATP is a not-for-profit association or partnership among players and tournament owners formed for their specific benefit and use. The player members join ATP because they have the reasonable expectation and trust that ATP will act on their behalf, support them, and represent their interests.

11. ATP's Articles of Incorporation and Bylaws provide that player members vote to elect the Player Council Delegates ("Player Council") for the purpose of providing professional tennis players a voice in the sport of men's professional tennis. The Player Council elects the three player representatives to serve on the Board of ATP and conveys to the player board the view of the players on various issues so that the player board may properly represent the players' interests.

12. Tennis players are essential to the success of ATP. The relationship between the players and ATP is co-dependent because one cannot exist without the other.

13. As a result of the foregoing, a relationship of trust exists between and among ATP and its members who are players and ATP owes a fiduciary duty to the players to protect the players' interests. For this reason, professional tennis player members of ATP are not represented by a collective bargaining agent. The terms and conditions of their membership and the rules of their sport are not products of collective bargaining or bona fide, arm's length negotiations, are not protected under federal labour laws, and do not involve the participation of the National Labor Relations Board.

14. Mr. Bradshaw is the Vice-President of the Board of Directors of ATP. Mr. Bradshaw has been with ATP for 30 years and has served as the Professional Tennis Integrity Officer ("PTIO") appointed by ATP since the inception of the Tennis Anti-Corruption Program ("TACP") in 2009.

15. Ms. McBride is Senior Vice President, Governance and Special Affairs Counsel for the WTA Tour Inc. ("WTA"). She is a Florida licensed attorney, and she was appointed by the WTA to serve as PTIO.

## IV.    BACKGROUND FACTS

### YH's Family

16. In August of 2015, YH started to focus on Futures tournaments. Futures are tournaments organized by the International Tennis Federation ("ITF") that allow for players to win career titles and improve their rankings. As of 2017, the prize fund for each tournament was either US$15,000 (singles) or US$25,000 (doubles). Some tournaments also provide housing for participants. Futures usually have sizable qualifying draws, which allow players to earn ATP ranking points. In 2019, reforms were implemented, and the Futures were renamed the ITF World Tennis Tour, which serves as players' pathway between the junior game and the elite levels of professional tennis. The launch of this tour is the culmination of a series of ITF reforms designed to support talented junior players in their progression to the senior game and target the prize money effectively at professional tournaments enabling more players to make a living.

17. YH's dream was to become a successful, high ranked, senior professional tennis player. His life was the game of tennis and his only source of income was the same.

4

18. Approximately in 2017, YH's father became seriously ill and the family's finances began to deteriorate. YH's older brother, Karim Hossam ("Karim"), a former professional tennis player, decided to engage in match-fixing to finance his own tennis career. Karim was successful in his match fixing undertaking. He fomented bets on several players, including his brother - without YH's knowledge, and received commissions for acting as a 'middleman' between professional tennis players and those involved in betting syndicates.

19. Karim used his knowledge of his brother to make educated guesses for his bettors. Karim's statements to third parties regarding YH's matches were speculative. Karim was clearly able to predict the outcome of matches played by YH based on Karim's deep and unique knowledge regarding every angle of his brother's mental state, health, and game.   YH was largely unaware of his brother's dealings regarding YH's matches.

20. In 2017, Karim was investigated by the Tennis Integrity Unit ("TIU"). To provide background, the TIU is funded by the international tennis governing bodies: ATP; WTA; ITF and Grand Slam Board (collectively, the "Governing Bodies"). The TIU is not independent of the Governing Bodies, which means that its investigative role is not sufficiently impartial and fair. The TIU employs investigators who are responsible for collecting and preparing final investigation reports. These investigators utilize forensic technology to obtain information from mobile phones and other electronic devices of players.

21. The TIU is aware of the fact that hackers tend to tamper with its investigations by providing to the TIU false alerts obtained from hacked accounts of journalists or other persons. As further explained below, YH has reason to believe, and does believe, that hackers were involved in the evidence utilized against YH. Further, the TIU has a history of assuming that a disciplinary charge may be based simply on evidence that a match had been contrived in that the player deliberately lost the match or part of it. As a result, the TIU has often failed to investigate and establish a corrupt link between player and bettor or other person. As explained below, the TIU failed to establish such link in YH's case.

22. The TIU was the subject of significant media criticism in early 2016. In January of 2021, the TIU will be abolished - as it should - and replaced by the International Tennis Integrity Agency, as a result of

5

heavy criticism for numerous actions and inactions undertaken by the TIU. The new agency will consist of a separate legal entity with greater independence from the Governing Bodies.

23. In 2018, Karim, who was not represented by a lawyer, confessed to all the charges against him and willingly and voluntarily produced all related evidence in his possession to the TIU. It was recognized that Karim proved to be forthcoming during his interview, and, as a result, Karim was offered a reduction of sanctions due to his cooperation. However, Karim refused the offer as he felt he should suffer the sanction for his wrongful actions. As a result, he was banned from tennis for life and was fined USD $15,000 for multiple match-fixing offences.

### YH Interviews

24. On January 23, 2018, the TIU investigator involved in Karim's investigation interviewed YH. YH refused to speak against his brother. Thereafter, the investigator repeatedly communicated directly with YH through electronic and other means, and conducted a second interview of YH. YH has reason to believe, and does believe, that the investigator was biased against YH because YH refused to speak against his brother and due to his brother's confessions.

25. The investigator indicated to YH that YH's "admissions" would be taken into consideration to mitigate his "sanctions." As a result, as further explained below, YH was led to admit to having taken actions YH did not take.

26. The TIU recommended to the PTIO that YH should be prosecuted for an inordinate number of alleged violations of the TACP.

### Role and Duties of Mr. Bradshaw and Ms. McBride as PTIO

27. To provide background, the PTIO figure was introduced by the TACP to act as initial arbiter of whether there may have been a corruption offense and determine whether a TIU recommended case should or should not be pursued. The PTIO is comprised of a team of four individuals drawn from a cross-section of the Governing Bodies to form an independent judgment as to whether the evidence in a TIU report meets the prevailing test for referring the matter to the Anti-Corruption Hearing Officer "AHO"). While analysing the evidence and recommendation provided by the TIU, deciding whether to

6

prosecute, and prosecuting players, these members have a duty to act fairly, without bias, impartially, and equally.

28. Mr. Bradshaw and Ms. McBride are members of the PTIO who breached their duties while analysing the TIU recommendation and prosecuting YH. Mr. Bradshaw and Ms. McBride's negligence benefitted themselves individually, the ATP, the WTA, and the other Governing Bodies to the detriment of YH by using him as a "fall guy" to help them check the box on a conviction regardless of its falsehood.

29. The practice developed since 2009, is that the TIU reports to the PTIO on formal and informal basis. Official meetings of the PTIO and TIU occur on average two to three times per year. During these meetings, among other agenda items, ongoing investigations are discussed. Investigations are also discussed outside the formal meetings. The formal handover of a TIU investigation to the PTIO involves the submission of a written investigation report by the director of the TIU to the PTIO. Thereafter, the PTIO review the report and vote as to whether a disciplinary proceeding should be initiated for an alleged corruption offense.

30. The authority to determine whether a player must answer for a corruption offense ultimately lies with the PTIO and not with the TIU. Reports submitted to the PTIO by the TIU do not oblige the PTIO to follow any conclusion or recommendation contained therein. Only if the PTIO concludes that a corruption offense may have been committed, then the PTIO shall refer the matter to the AHO. The PTIO is tasked with commencing prosecution of an alleged corruption offense and presenting the prosecution, through lawyers engaged by the PTIO, at a hearing before the AHO.

31. The PTIO has been criticized for the lack of independence from the Governing Bodies and the mistaken and inappropriate use of discretion in deciding not to initiate disciplinary proceedings for a TACP offense. Specifically, the PTIO received criticism for taking inappropriate decisions that might have been appropriate had the PTIO been independent of the Governing Bodies. The conflict of interest is clear. The PTIO is influenced by the interests of the Governing Bodies in exercising judgment on whether to pursue disciplinary actions.

32. In this case, YH has reason to believe, and does believe, that Mr. Bradshaw and Ms. McBride prosecuted YH, among other wrongful reasons explained below, to further the interests of the Governing Bodies that employed and appointed these individuals. The Governing Bodies were interested in prosecuting lower rank players, such as YH, to avert criticism regarding the high level of corruption in tennis.

33. Further, the PTIO received numerous reports from 2009 through 2016 and was heavily criticized for failing to prosecute some of those cases. YH has reason to believe, and does believe, that Mr. Bradshaw and Ms. McBride prosecuted YH to divert such criticism away from the PTIO and protect themselves in their role.

34. It has been rightfully recommended that the charging authority be removed from the PTIO and left entirely in the hands of the newly created, more independent, International Tennis Integrity Agency. YH has reason to believe, and does believe, that Mr. Bradshaw and Ms. McBride prosecuted YH to divert such criticism and protect their PTIO role. Further, YH has reason to believe, and does believe, that Mr. Bradshaw and Ms. McBride were biased against YH due to his brother's confessed crimes and due to YH's refusal to speak against his brother. The aforementioned motives and the divergent interests between YH and the Governing Bodies, including ATP and WTA, led Mr. Bradshaw and Ms. McBride to act with gross negligence in the analysis and prosecution of YH's case.

### Mr. Bradshaw and Ms. McBride's Grossly Negligent Breach of their Duties

35. Mr. Bradshaw and Ms. McBride intentionally frustrated YH's expectation that the PTIO would fulfil its duty to impartially analyse the lack of evidence and require further investigation by the TIU or refuse to prosecute YH. As a result thereof and for the reasons stated below, YH had no choice but to pursue this action.

36. On 14 August 2019, the PTIO issued a Notice of Charges against YH informing him that he would be prosecuted for eighteen alleged violations of the TACP before the AHO. Egregiously, in February 2020, the PTIO added an additional charge for a total of nineteen charges.

37. When YH was informed that he was himself being investigated and prosecuted for potential violations of the TACP, YH was distraught and perplexed at the thought that the actions of his brother would be wrongfully impugned upon him. Unfortunately, this is exactly what happened to YH as a result of the ATP, Mr. Bradshaw and Ms. McBride's discrimination against YH, actions in their own self-interest, gross negligence and breach of duties.

38. To make matters worse, Mr. Bradshaw and Ms. McBride utilized the following flawed evidence against YH:

i.  WhatsApp message found in Mr. Konstantinos Mikos ("Mr. Mikos") cellular as evidence that YH failed to promptly report the fact that YH was approached with a match fixing proposal.

- Mr. Mikos was also prosecuted by Mr. Bradshaw and Ms. McBride, and the <u>AHO found that Mr. Mikos did **not** approach YH.</u> Nevertheless, Mr. Bradshaw and Ms. McBride prosecuted YH as if Mr. Mikos had approached YH. Accordingly, they based their determination on false facts.

- Mr. Bradshaw and Ms. McBride refused to provide to YH the decision rendered in Mr. Pehar's case, despite the fact that they were required to produce such decision. YH has reason to believe, and does believe, that Mr. Bradshaw and Ms. McBride withheld the favourable decision rendered in Mr. Mikos' case from YH to prevent YH's discovery of the grossly negligent manner in which Mr. Bradshaw and Ms. McBride discharged their PTIO's duties, the ATP's breach of its fiduciary duty to YH, and their clear bias against YH. These actions by Mr. Bradshaw and Ms. McBride directly prevented YH from properly defending himself and consequently greatly contributed to YH's belief that the only manner in which he could avoid banishment would be to admit to taking actions he did not take.

- This message does not contain the metadata, and the veracity of this so-called evidence is lacking.

9

- This message does not provide information regarding date, type of match, opponent, or sums proposed. There is no information connecting the message to an event covered by the TACP. To date, the event referenced in the message has not been identified.

- There is no evidence that any consideration was offered to YH. This is another element of the rule allegedly violated by YH. In fact, as mentioned, it had previously been determined by the AHO in Mr. Mikos' case that there had been no approach, so there could be no payment to YH.

- Mr. Bradshaw and Ms. McBride argued that consideration was offered to YH on another occasion. They failed to provide any evidence of this fact, the date or specifics for that matter -- because such evidence does not exist.

ii.    Facebook messages between YH and Issam Hitham Taweel ("Mr Taweel") dated February 17 and 18 of 2017, in which Mr. Taweel asked YH to play doubles with him in the next tournament. According to this message, which was false, YH initially refused, but on the next day, YH sent a message stating he would "play doubles but mangawy." Mr. Bradshaw and Ms. McBride utilized this message as evidence that: (1) YH committed match fixing; and (2) YH made a corrupt approach to Mr. Taweel soliciting Mr. Taweel to not use his best efforts.

- Mr. Bradshaw and Ms. McBride did not charge Mr. Taweel for failing to report YH's alleged approach. This is a blatant indication of Mr. Bradshaw and Ms. McBride's bias against YH. This is also evidence of the gross negligence in which they discharged their PTIO duties because when a case concerns an offense involving more than one person subject to the TACP, the existing body of AHO's decisions indicate that the PTIO should allow the AHO to consider the evidence as a whole and decide on each player's responsibility, possibly on a consolidated basis. As an example, an AHO has required the consolidation of the cases concerning the same offense committed by two persons,

because "[t]here are two separate but companion decisions…", which "…should be read in conjunction with one another."

- Mr. Bradshaw and Ms. McBride argued that the reference to mango and fruit in messages are codes to indicate that players want to fix a game. This was not based on any evidence relating to YH.

- YH explained that his Facebook account and the account of Mr. Taweel had been hacked. However, Mr. Bradshaw and Ms. McBride ignored his explanation.

- This so-called message was <u>provided by an anonymous source.</u> Mr. Bradshaw and Ms. McBride asserted in the Notice of Charges that they are "not currently aware of this individual's identity". To date, the anonymous source who appears to have fabricated this message has yet to be revealed.

- There therefore is no evidence that this message was actually exchanged by YH and Mr. Taweel.

- Mr. Bradshaw and Ms. McBride did not - because they could not - authenticate this social media post.

- This anonymous source did not testify, and Mr. Bradshaw and Ms. McBride effectively prevented YH from cross examining this anonymous source.

- It cannot be disputed that anonymous tips cannot be considered (especially in a life ban case) because they do not demonstrate the informant's basis of knowledge or veracity. Even the US Supreme Court has asserted that "[unlike] a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, … an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." There is obviously no probative value in evidence provided by anonymous sources. Nevertheless, Mr. Bradshaw and Ms. McBride egregiously relied on such "evidence" to prosecute YH.

iii.  Facebook message dated February 22, 2017 which was sent by YH to Mr. Taweel as evidence that (1) YH made a corrupt approach to Mr. Taweel; (2) YH failed to report his own approach to Mr. Taweel; and (3) YH tampered with evidence by deleting such message.

- There is no evidence that YH deleted this message after he was approached by the TIU, despite the fact that the investigator had unfettered access to all YH's personal devices and social media accounts.

- YH has reason to believe, and does believe, that the source of this message is a hacker. Further, YH has reason to believe, and does believe, that the investigator knew and engaged with the hacker, and that Mr. Bradshaw and Ms. McBride knew or should have known that the investigator was engaging with hackers and the evidence was unreliable, tampered with, and not credible.

- To make matters worse, in an apparent attempt to justify the fact that this message was fabricated by a hacker, Mr. Bradshaw and Ms. McBride charged YH with tampering/destroying this message.

- Mr. Bradshaw and Ms. McBride alleged that the fact that YH accessed his own Facebook account after the investigator requested YH's Facebook login information was sufficient evidence that this message was legitimate and that it was deleted by YH.

- YH did not exchange this message, much less delete it. There is nothing preventing or prohibiting YH from accessing his social media while he is under investigation. YH was not warned that his access to his own Facebook account during investigations would, without more, be taken as sufficient evidence of his alleged tampering with evidence.

iv.  Facebook message from 2015 provided by YH himself as evidence that YH failed to promptly report knowledge of match fixing.

- YH explained that he saw the message for the first time after his first interview and provided it to the investigator on the next day, January 23, 2018. YH further explained

that, in 2015, his Facebook account was set up in a manner in which messages from non-Facebook friends went directly to a separate inbox that was titled "Other Inbox" including a spam folder that was not visible to YH unless he intentionally opened it. However, Mr. Bradshaw and Ms. McBride ignored his explanation.

- There is no evidence that YH had prior knowledge of the message, even though the investigator had unfettered access to YH's Facebook account and electronic devices.

- There is no information connecting the message to an event covered by the TACP. To date, the event referenced in the message has not been identified.

- Mr. Bradshaw and Ms. McBride ignored the lack of any indication of prior knowledge or the fact that the message could possibly relate to an event not covered by the TACP.

v.  WhatsApp message from Robbie Ridout ("Mr. Ridout") as evidence that YH failed to promptly report the fact that YH was approached with a match fixing proposal.

- Mr. Bradshaw and Ms. McBride did not prosecute Mr. Ridout.

- Mr. Bradshaw and Ms. McBride alleged that this message was "most likely in 2015 or 2016." There is no information regarding the date, match, or opponent. There is no information connecting the message to an event covered by the TACP.

vi.  Picture of Western Union transfer of USD $315, allegedly sent by Nail Radikovich Rakhimyanov ("Mr. Nail") to YH to show that YH facilitated Mr. Nail's wager on YH's games.

- Mr. Bradshaw and Ms. McBride never prosecuted Mr. Inoyatov, who originated the wire transfer, for match fixing, wagering, or soliciting YH not to use his best efforts. However, they prosecuted YH for match fixing and facilitating the wagering allegedly initiated by Mr. Inoyatov. This is another clear indication of Mr. Bradshaw and Ms. McBride's bias against YH. This is also evidence of the gross negligence in which they discharged their PTIO duties because, as explained, when a case concerns an offense involving more than one person subject to the TACP, the existing body of AHO's decisions indicate that the

13

PTIO should allow the AHO to consider the evidence as a whole and decide on each player's responsibility, possibly on a consolidated basis.

- There is no evidence that the funds were sent to YH for YH's benefit for a match fixing arrangement.

- There is no evidence that YH knew the reason why the funds were sent to him.

- There is no evidence establishing any reason for the money transfer.

- There is no evidence corroborating any reasonable inference that the payment was made for a corrupt action. A note by Karim (explained below) was also provided by Mr. Bradshaw and Ms. McBride as "evidence". However, for the reasons explained below, it is wholly insufficient and clearly another shameless attempt to hide their true motives.

- It is undisputed that YH never collected such payment at any Western Union location.

vii.    Handwritten note drafted by Karim identifying matches in which Karim admitted facilitating betting. The note includes a match played by YH against Aldin Setkic ("Mr. Setkic") as evidence that YH facilitated a wager and contrived or attempted to contrive the outcome of an event covered by the TACP.

- Mr. Bradshaw and Ms. McBride did not prosecute the individual who allegedly placed the bet on this match, Mr. Inoyatov.

- Karim explained that his note was not limited to matches fixed by Karim, but also included matches in which Karim made or coordinated bets.

- Mr. Bradshaw and Ms. McBride admitted they did not have any evidence that YH knew of the bet, even though the investigator had full access to YH's personal devices and social media accounts.

- Mr. Bradshaw and Ms. McBride argued that YH had fixed the match simply because YH is the brother of Karim -- without more.

14

- Mr. Bradshaw and Ms. McBride ignored several facts that naturally lead to a greatly different conclusion, including: (1) Karim was able to predict the outcome of the match based on his deep and unique knowledge of his brother's game; (2) Karim frequently pulled guesses with bettors and not always fixed the matches; (3) YH had played against the same opponent and lost twice (both times in straight sets); (4) YH was ranked 624 while the opponent was ranked 226; (5) the opponent was the seeded player; (6) during the seven weeks preceding this match, YH had played no less than 22 single matches and was fatigued; (7) right before this match, YH was in Cairo taking college exams and was unable to prepare for this match; (8) YH never had a chance of winning that match; and (9) AHO applicable jurisprudence clearly establishing that losing a match or a set is not evidence of match fixing. Ms. McBride's refusal to abide by applicable jurisprudence is even more egregious because she is an common law trained attorney.

viii.    The aforementioned handwritten list by Karim, which identifies a match against Fernandez Lopez, together with a telegram message between Karim and known corruptor called Gregory el a5eer ("Mr. Gregory") regarding the match against Fernandez Lopez were utilized as evidence that YH facilitated wager and contrived or attempted to contrive the outcome of an event.

- Karim had explained he called Mr. Gregory to place the bet when Karim saw that YH had broken a string. Karim knew YH too well. He knew YH would be unable to continue playing well because YH would need some time to adjust to the new racket. In this game, YH performed 2 aces and 2 doubles faults in the score sheet. Any person who has an understanding of tennis, such as Mr. Bradshaw and Ms. McBride should have, knows well that the scoresheet evidences that YH was making a strong effort to win the game (not seeking to lose on purpose), but YH play was compromised due to the new string. Exactly as Karim had predicted.

- YH was completely unaware of the bet.

- Mr. Bradshaw and Ms. McBride argued that it was implausible for YH not to be involved in the arrangement and not to have cooperated, even though there is no evidence implicating YH regarding this match.

- Mr. Bradshaw and Ms. McBride ignored AHO jurisprudence finding that it is untenable to condemn a player on the basis of third parties discussing the possibility of fixing the player's matches without evidence of the player knowing or agreeing, even when the scorecard shows an according result. Had Mr. Bradshaw and Ms. McBride acted prudently in discharging their duties, they would have acted differently in light of the fact that there is no evidence that YH was aware or in agreement with Karim's agreement for the match with Fernando Lopez, and also considering the fact that there is no evidence that YH was aware of Mr. Gregory's bet or in agreement with Mr. Gregory. Ms. McBride's refusal to abide by applicable jurisprudence is even more egregious because she is an common law trained attorney.

ix.  Facebook conversation between Karim and YH provided by an anonymous source, in which Karim asked YH to ask their mother to deactivate Karim's SIM card as evidence that YH tampered with or destroyed evidence relating to a corruption offense.

- Karim himself was not prosecuted for allegedly asking YH to ask their mother to destroy any evidence.

- All data can be downloaded irrespective of whether a cellular SIM card is deactivated.

- There is no evidence that Karim aimed to destroy evidence by deactivating the SIM card, clearly because it could not be accomplished and also because it is well recognized that Karim fully cooperated.

- Even if there was any indication of Karim's intent to destroy evidence, there is no evidence of YH's intent to destroy evidence by transmitting his brother's request to his mother.

- YH never deactivated the SIM card.

- To date, the anonymous source has never been revealed and the veracity of the purported message was not questioned by Mr. Bradshaw and Ms. McBride.

- As noted, anonymous tips cannot be considered because they do not demonstrate the informant's basis of knowledge or veracity. There is obviously no probative value in evidence provided by anonymous sources. Nevertheless, Mr. Bradshaw and Ms. McBride egregiously relied on such "evidence" to prosecute YH.

x. Karim telegram exchange with a corruptor known as Lex's Friend to show that YH allegedly agreed with Karim to fix the first set of a match against Mr. Taweel.

- Karim was not prosecuted for this approach.

- YH was unaware of any fix or bet, and there is no evidence to the contrary.

- YH played well and won the last two sets.

- There is no evidence that YH was aware of any fix or bet.

xi. The fact that YH was playing well, lost the first set 7-5, was 3-3 on the second match, and then tanked 3 games in a few minutes in a match against Felip Peliwo ("Mr. Peliwo"). This evidence was utilized as proof that YH had agreed with Karim to fix the score in the second set.

- Mr. Bradshaw and Ms. McBride did not prosecute the alleged corruptor, Mr. Inoyatov, and the individual who allegedly requested YH to fix this match, Mr. Taweel, for their actions with respect to this match. However, Mr. Bradshaw and Ms. McBride prosecuted YH for fixing the result of the match against Mr. Peliwo, by request of Mr. Taweel, to facilitate Mr. Inoyatov's wagering.

- There is no evidence that YH had any knowledge or agreed with any agreement between Karim and Mr. Yoratov.

- Mr. Bradshaw and Ms. McBride ignored AHO's jurisprudence asserting that players should not be prosecuted without evidence of their knowledge and agreement concerning

match fixing. McBride's refusal to abide by applicable jurisprudence is even more egregious because she is an common law trained attorney.

- YH explained that he had learned that his father had a heart failure. YH was therefore emotionally exhausted due to his father's illness and his financial distress. YH also explained that he only played because he could not afford the USD 500 fine for leaving the tournament. However, Mr. Bradshaw and Ms. McBride ignored this explanation.

- Players in the top 20, such as Nick Kyrgios and Benoit Paire, have tanked matches, but were never prosecuted by Mr. Bradshaw and Ms. McBride for match fixing as a result of tanking.

xii.   Facebook message provided by an anonymous source as evidence that YH fixed the first set of his match against Omar Elkadi with Karim.

- Mr. Mikos was also prosecuted by Mr. Bradshaw and Ms. McBride, and the AHO found that Mr. Mikos did **not** approach YH. Nevertheless, Mr. Bradshaw and Ms. McBride prosecuted YH as if Mr. Mikos had approached YH. Accordingly, they based their determination on false facts.

- YH explained that he purposefully lost the first set because YH and Elkadi were friends growing up and trained together in Egypt. That emotion affected him. YH was higher ranked and knew he would win. Elkadi's entire family was present at the match, and YH lost the first set. YH's conduct was clearly unrelated to the alleged offense. However, Mr. Bradshaw and Ms. McBride ignored his explanation.

- YH was completely unaware of any fix or bet and there is no evidence to the contrary.

- Mr. Bradshaw and Ms. McBride ignored applicable AHO jurisprudence that evidence linking the player to the match fix is required, and betting alerts by themselves are not enough to assume a player's liability for match fixing. McBride's refusal to abide by

applicable jurisprudence is even more egregious because she is an common law trained attorney.

xiii.    Betting alerts for a match between YH and Edis Fetisleam and messages from Karim to bettors stating that his brother had purportedly confirmed the fix.

- YH explained that he tanked and lost three sets because he was concerned with his own physical safety. YH was alone in a strange country known for unrest, and the organization of the tournament in Romania was precarious. The alleged bet in this match was just for the first set. However, YH also lost the additional two sets with worse scores, even though there was no alleged bet on those additional matches. YH tanked because he was preoccupied with his surroundings and wanted to leave. He had already booked a flight to leave.  Further, YH was injured and suffering from biceps tendonitis. YH went back to his home and refrained from competing for over an entire month. YH was constantly competing, but was forced to take the time to heal. However, Mr. Bradshaw and Ms. McBride ignored his explanation.
- YH was unaware of any fix or bet, and there is no evidence to the contrary.
- Mr. Bradshaw and Ms. McBride ignored well settled applicable AHO jurisprudence that evidence linking the player to the match fix is required, and betting alerts by themselves are not enough to assume a player's liability for match fixing.

39. YH learned that he would be severely sanctioned even if the investigators did not find sufficient evidence against YH due to the apparent bias against YH. As a result of the actions of Karim, YH had reason to believe and did believe that he would have no redress because the only possible way to appeal such sanctions would require substantial financial investment, which YH could not financially afford.

**The Prosecution of YH By Mr. Bradshaw and Ms. McBride Without Evidence**

40. During the proceedings before the AHO, Mr. Bradshaw and Ms. McBride, through the law firm they engaged for YH's prosecution, prosecuted YH not only for not reporting his own brother's violations,

but for committing acts that were confessed by Karim -- as if such acts had been committed by YH without substantive evidence to support such conviction.

41. As mentioned, Mr. Bradshaw and Ms. McBride refused to provide to YH the decision rendered in Mr. Pehar's case, despite the fact that they were required to produce such decision most probably to prevent YH's discovery of the grossly negligent manner in which Mr. Bradshaw and Ms. McBride discharged their PTIO's duties, the ATP's breach of its fiduciary duty to YH, and their clear bias and discrimination against YH.

42. To make matters worse, Mr. Bradshaw and Ms. McBride withheld several additional AHO decisions that: (i) are not available to the general public; (ii) were relevant to YH's case; (iii) Mr. Bradshaw and Ms. McBride were required to provide to YH;  and (iv) were favourable to YH. These wrongful actions by Mr. Bradshaw and Ms. McBride directly obstructed YH's defense and created a misleading case for the AHO. They greatly contributed to YH's belief that the only manner in which he could avoid banishment would be to admit to taking actions he did not take, which resulted in YH's banishment.  These actions are even more egregious in light of the fact that Ms. McBride is an attorney trained in common law, which significantly raises her duty of care. She should have known the importance of those decisions and provided them to YH as required.

43. YH requested all the documents related to the TIU investigation against him. Mr. Bradshaw and Ms. McBride failed and refused to provide the information alleging that they were prevented from doing so due to applicable data protection laws. However, the alleged data protection laws were not applicable. YH has reason to believe, and does believe that there were and are no documents to support their position because there was no proper investigation of YH's so-called case other than his interviews and evidence provided by "anonymous sources."

44. Further, Mr. Bradshaw and Ms. McBride  failed and refused to provide YH with the right to examine witnesses against him -- or to even disclose them for that matter.

45. YH was told that the PTIO and AHO were prejudiced against him because he was a lower ranked player and due to his brother's confessions and his refusal to assist in the investigation against his brother.

Further, YH learned that he would not be able to financially afford an appeal from an unfavourable decision of the AHO, which could forever ban him from the tennis profession. The ban contemplated not only prohibits tennis players from competing, but also from coaching since a banned player is barred from participating in any event as a player or as a coach, and no player would engage a coach who cannot attend the player's games.

46. The lack of evidence and serious issues with the veracity of the evidence presented and used against YH indicates that, when deciding to prosecute YH and prosecuting YH, Mr. Bradshaw and Ms. McBride, had one goal in mind, a determination of guilt and acted for the benefit of ATP and their own benefit to the detriment of providing YH a fair evaluation or even a shot. Mr. Bradshaw and Ms. McBride's bogus prosecution of YH was driven by the pressures imposed by the public, the media, and the review board to prosecute "all" cases presented by the TIU. They used YH to check off a proverbial box. Further, Mr. Bradshaw and Ms. McBride let the criticisms directed at the PTIO and the perceived threat that their role might be abolished in the tennis arena drive their prosecution of YH to the detriment of YH. Of all lower ranked players mentioned in the documents utilized in YH's prosecution, YH was the easiest target due to the existing bias against his family.

47. Mr. Bradshaw and Ms. McBride acted outside of their role and utilized their positions to prosecute YH without proper analysis and weight of the evidence, or lack thereof, against YH to avert heavy scrutiny and criticism against the organizations that appointed them and against their PTIO role for the benefit of those organizations and for their own personal benefit and advancement.

48. Given the circumstances, YH had a reasonable expectation that, by making certain admissions, he would be able to mitigate sanctions that could be mistakenly applied against him due to existing bias. YH understood that admissions could preclude the application of a sanction that would prevent him from continuing to play tennis -- the only thing that provided purpose and meaning to YH's life. Thus, feeling cornered and forced, the young tennis player acted upon the advice to admit to actions he never took, which lacked any evidence or truth. YH was under the guided misbelief that his admissions would allow

him to mitigate potential sanctions and avoid being banned from playing tennis and admitted to having taken actions YH did not take.

49.    In March of 2020, YH's hearing before the AHO took place.

50.    It appears that, the PTIO's tactic of "throwing everything in the kitchen sink" and charging him for numerous crimes committed by his brother paid off. It appears that, Mr. Bradshaw and Ms. McBride were successful in prosecuting YH, among other reasons, because the AHO felt compelled to find YH guilty of some of the numerous offenses charged.

51.    The AHO noted that "bearing in mind the Hossam family's involvement in corruption, it might be said that the player had no chance of avoiding match fixing." This statement shows that Mr. Bradshaw and Ms. McBride were successful in prosecuting YH, among other reasons, because the AHO seems to have been also biased against YH due to his brother's confessed crimes.

52.    During the proceedings before the AHO, YH explained that his main aim when he admitted certain violations was to obtain the lightest sanction possible and be allowed to continue to do what he lived for -- playing tennis. The AHO did not have the complete context of YH's understanding of how YH would not be able to appeal any unfavourable decision, the offer made by the investigator to YH's brother, and how YH felt compelled to "admit" to having taken actions he did not take because he was led to believe that it was the only path that would allow him to continue in the only profession he knew and loved. As a result, the AHO found that YH was repeatedly dishonest.

53. On May 4, 2020, the AHO issued her decision imposing a lifetime ban on YH.

54. YH seeks redress before this Court, not to revert the AHO's decision, but to be compensated for the losses resulting from ATP, Mr. Bradshaw and Ms. McBride's intentional conduct. Even if the life ban is revoked, the tarnish to YH's reputation at the peak point of his tennis career cannot be rescinded.

55. If YH were allowed to continue playing at the peak of his career without this tarnish to his reputation, he would have a yearly sponsorship in addition to the potential for other earnings. As a result of the foregoing intentional actions of the ATP, Mr. Bradshaw and Ms. McBride, YH suffered significant damages, including, but not limited to, damages to his name, reputation, good will, loss of publicity

income, loss of existing and potential sponsorship contracts and income, loss of existing and potential employment opportunities, loss of career advancement opportunities, loss of potential prize money and other tournament earnings, loss of alternative employment opportunities related to the sport of professional tennis, and other significant economic losses including compensatory, special and consequential damages.

<u>**COUNT I - Gross Negligence Against Mr. Bradshaw and Ms. McBride**</u>

56. Paragraphs 1 through 48, inclusive, are incorporated herein by reference as if fully set forth herein.

57. When they accepted their PTIO role, Mr. Bradshaw and Ms. McBride undertook a duty to all players, including YH, to act as initial arbiter of whether there may have been a corruption offense and to determine whether a TIU recommended case should or should not be pursued. Further, they undertook the duty to form an independent judgment as to whether the evidence in a TIU report meets the prevailing test for referring the matter to the AHO. Further, they undertook a duty to act fairly, without bias, impartially, and equally when analysing the evidence and recommendation provided by the TIU, deciding whether to prosecute, and prosecuting players. Finally, they undertook the duty to refer a matter to the AHO only if they concluded, after their independent review of the TIU evidence, that a corruption offense may have been committed. These duties are owed by Mr. Bradshaw and Ms. McBride to all players, irrespective of their rankings.

58. Mr. Bradshaw and Ms. McBride breached their duties by failing or refusing to analyse the evidence provided by the TIU, failing or refusing to form an independent judgment as to whether the evidence against YH met the prevailing test for referring YH's case to the TIU, failing to act without bias, impartially and equally, and prosecuting YH's case in light of the lack of additional evidence.

59. Mr. Bradshaw and Ms. McBride further breached their fiduciary duties by acting for the benefit of the organizations that appointed them when deciding whether to prosecute and prosecuting YH's case. They let the pressure to prosecute all cases presented by the TIU drive the prosecution of YH.

60. Mr. Bradshaw and Ms. McBride further breached their fiduciary duties by acting for their own benefit when deciding whether to prosecute and prosecuting YH's case. Mr. Bradshaw and Ms. McBride let the threat of having their role abolished drive the prosecution of YH.

61. Had Mr. Bradshaw and Ms. McBride undertaken an independent review of the TIU's evidence - or lack thereof - they would have inquired about the anonymous sources providing so-called evidence and would have learned about the interviewer's probable dealings and reliance upon evidence provided and/or fabricated by hackers. Had Mr. Bradshaw and Ms. McBride properly analysed the evidenced, they would have inquired into the lack thereof.

62. YH has reason to believe, and does believe, that Mr. Bradshaw and Ms. McBride acted intentionally outside of their role without proper analysis of the evidence against YH to avert heavy scrutiny and criticism against the organizations that appointed them and against their PTIO role for the benefit of those organizations and for their own benefit. As a result, Mr. Bradshaw and Ms. McBride are personally liable for their actions.

63. As a result of the foregoing gross negligence and/or intentional actions of Mr. Bradshaw and Ms. McBride, YH suffered significant damages, including, but not limited to, damages to his name, reputation, good will, loss of publicity income, loss of existing and potential sponsorship contracts and income, loss of existing and potential employment opportunities, loss of career advancement opportunities, loss of potential prize money and other tournament earnings, loss of alternative employment opportunities related to the sport of professional tennis, and other significant economic losses including compensatory, special and consequential damages.

WHEREFORE, Plaintiff, Youssef Hossam, respectfully demands judgment against Mr. Bradshaw and Ms. McBride, jointly and severally, for damages, the total amount to be proven at trial, attorney's fees and costs, pre and post judgment interest at the legal rate, and such other relief as this court deems just and proper.

## COUNT II - Breach of Fiduciary Duty Against ATP

64. Paragraphs 1 through 48, inclusive, are incorporated herein by reference as if fully set forth herein.

65. ATP owed a fiduciary duty to YH as a member of the ATP.

66. ATP breached its fiduciary duty to YH by appointing Mr. Bradshaw as PTIO. ATP knew, or should have known, that Mr. Bradshaw would fail to act impartially when faced with the task of analysing the evidence against YH and other low ranked players and prosecuting them.

67. ATP also breached its fiduciary duty by pressuring Mr. Bradshaw to prosecute all cases presented by the TIU to avert the unfavourable media, general public and review board impressions.

68. ATP further breached its fiduciary duty by making false representations that it would support its player members knowing this assertion was false with respect to lower ranked players.

69. As a result of the foregoing intentional actions of the ATP, YH suffered significant damages, including, but not limited to, damages to his name, reputation, good will, loss of publicity income, loss of existing and potential sponsorship contracts and income, loss of existing and potential employment opportunities, loss of career advancement opportunities, loss of potential prize money and other tournament earnings, loss of alternative employment opportunities related to the sport of professional tennis, and other significant economic losses including compensatory, special and consequential damages.

WHEREFORE, Plaintiff, Youssef Hossam, respectfully demands judgment against ATP for damages, the total amount to be proven at trial, attorney's fees and costs, pre and post judgment interest at the legal rate, and such other relief as this court deems just and proper.

## COUNT III - Negligence Against ATP

70. Paragraphs 1 through 48 inclusive, are incorporated herein by reference as if fully set forth herein.

71. ATP owed a duty to YH to exercise reasonable care in appointing a PTIO member who will act impartially when analysing whether to prosecute and prosecuting cases against all players, including YH.

72. ATP breached its fiduciary duty to YH by appointing Mr. Bradshaw as PTIO.

73.  ATP knew, or should have known, that Mr. Bradshaw would fail to fulfil his PTIO duties when faced with the task of analysing the evidence against YH and other low ranked players because Mr. Bradshaw was with the ATP for over 30 years.

74.  As a result of ATP's negligence, YH suffered significant damages, including, but not limited to, damages to his name, reputation, good will, loss of publicity income, loss of existing and potential sponsorship contracts and income, loss of existing and potential employment opportunities, loss of career advancement opportunities, loss of potential prize money and other tournament earnings, loss of alternative employment opportunities related to the sport of professional tennis, and other significant economic losses including compensatory, special and consequential damages.

WHEREFORE, Plaintiff, Youssef Hossam, respectfully demands judgment against ATP for damages, the total amount to be proven at trial, attorney's fees and costs, pre and post judgment interest at the legal rate, and such other relief as this court deems just and proper.

### COUNT IV- Negligent Misrepresentation Against ATP

75.  Paragraphs 1 through 48, inclusive, are incorporated herein by reference.

76.  ATP asserted that its  purpose includes promoting and furthering the interest of professional tennis players, and improving the conditions under which professional tennis players engage in their occupation. ATP asserted it would  act on behalf of its player members and provide support to its player members.

77.  These representations were false with respect to lower ranked players such as YH.

78.  ATP should have known the representation was false with respect to lower ranked players because several lower ranked players have complained to ATP in the past.

79.  ATP intended to induce all players, including lower ranked players such as YH, to join ATP based upon these misrepresentations.

80.  YH joined ATP in justifiable reliance upon the representations of ATP.

81.  As a result of ATP's negligent misrepresentation, YH suffered significant damages, including, but not limited to, damages to his name, reputation, good will, loss of publicity income, loss of existing and

potential sponsorship contracts and income, loss of existing and potential employment opportunities, loss of career advancement opportunities, loss of potential prize money and other tournament earnings, loss of alternative employment opportunities related to the sport of professional tennis, and other significant economic losses including compensatory, special and consequential damages.

WHEREFORE, Plaintiff, Youssef Hossam, respectfully demands judgment against ATP for damages, the total amount to be proven at trial, attorney's fees and costs, pre and post judgment interest at the legal rate, and such other relief as this court deems just and proper.

<u>**COUNT V- Fraud Against ATP**</u>

82. Paragraphs 1 through 48, inclusive, are incorporated herein by reference.

83. ATP represented to all players, including YH, that ATP's purposes are, among others, to promote and further the interest of professional tennis players, and to improve the conditions under which professional tennis players engage in their occupation.

84. ATP knew this statement was false.

85. ATP intended YH to rely and act on this statement.

86. YH justifiably relied on this statement to his detriment.

WHEREFORE, Plaintiff, Youssef Hossam, respectfully demands judgment against ATP for damages, the total amount to be proven at trial, attorney's fees and costs, pre and post judgment interest at the legal rate, and such other relief as this court deems just and proper.

Respectfully submitted,

Dated: January 8, 2021.


BAKER & MCKENZIE LLP
Suite 1700
Sabadell Financial Center
1111 Brickell Avenue
Miami, Florida 3331
Telephone: (305) 789-8976
Email: daniela.fonsecapuggina@bakermckenzie.com


By: /s/ Daniela Fonseca Puggina
Florida Bar No. 0650501

*Attorneys for Plaintiff*
*Youssef Hossam*